Argued April 10, decided April 23, 1912.

## CONSOR *v.* ANDREW.

[123 Pac. 46.]

APPEAL AND ERROR—VERDICT—CONCLUSIVENESS.

1. While an inference is a species of evidence, it is not such evidence
as will prevent setting aside a verdict under Section 3, Article VII,
Constitution of Oregon, as amended November 8, 1910 (Laws 1911,
p. 7), providing that no fact tried by a jury shall be otherwise
re-examined in any court, unless the court can affirmatively say that
there is no evidence to support the verdict.

EVIDENCE—PRESUMPTION—BURDEN OF PROOF.

2. A disputable presumption, such as that raised by Section 799,
subd. 7, L. O. L., that money paid by one to another was due to the
latter, operates to shift the burden of proof, which is shifted by every
kind of evidence strong enough to establish a *prima facie* case.

EVIDENCE—PRESUMPTION—REBUTTAL.

3. In a civil action, a presumption is available until its effect is
overcome by opposing evidence or by a contrary presumption.

EXECUTORS AND ADMINISTRATORS—CLAIMS AGANIST ESTATE—SUFFI-
      CIENCY OF EVIDENCE.
    4. Evidence outside af claimant's testimony in proceedings against
an estate *held* not to sustain a finding that the money claimed was
loaned to intestate.

From Multnomah: JOHN B. CLELAND, Judge.

Statement by MR. JUSTICE MOORE.

This is a proceeding by Herbert P. Consor against John Andrew, administrator of the estate of George H. Lucke, deceased, to establish a demand against a decedent's estate. George H. Lucke died intestate in Multnomah County September 4, 1909, and letters of administration upon the estate were issued to John Andrew, who duly qualified for the trust. Herbert P. Consor exhibited a verified claim against the estate in the sum of $1,620, with interest, for money asserted to have been loaned to the deceased, but the demand, having been rejected by the administrator, was presented to the county court of that county, which also disallowed it. From the latter determination an appeal was taken to the circuit court for that county where the cause was tried *de novo,* resulting in a verdict and judgment for the claimant in the amount demanded, and the administrator appeals to this court.        REVERSED.

For appellant there was a brief over the names of *Messrs. Allen & Mulkey* and *Mr. W. A. Johnson,* with an oral argument by *Mr. F. W. Mulkey.*

For respondent there was a brief over the names of *Messrs. Chamberlain, Thomas & Kraemer* and *Mr. L. W. Humphrey,* with an oral argument by *Mr. Otto J. Kraemer.*

MR. JUSTICE MOORE delivered the opinion of the court.

The testimony shows that the claimant's wife was a niece of George H. Lucke, and, though she lived with

him and his wife 18 years prior to her marriage, she was never adopted by them. A witness speaking of the intimacy existing between the persons named, said:

"Mr. and Mrs. Lucke considered Mr. and Mrs. Herbert P. Consor just about the same as though they were their own children."

In consequence of illness, Mrs. Consor, returned, March 8, 1899, with her daughter Jessie H., then nearly six years old, to the home of Mr. and Mrs. Lucke, where they resided until September 25, 1900, when Mrs. Consor died, but the daughter remained until October 1, 1907, when she went to live with her father in Chicago. Lucke had been a soldier and received a small pension, which settled monthly allowance and trifling sums obtained from the sale of fruit raised on a lot in Portland owned by Mrs. Lucke constituted their income. Consor testified that in October, 1900, in a conversation with Mr. and Mrs. Lucke, he agreed to pay them $15 a month for the board, lodging, etc., of his daughter, and also to advance the further sum of $20 monthly, in consideration of which latter payment they stipulated either to reimburse him or upon their death to leave to him their property, consisting of a house and lot, known as No. 1125 East Taylor street, Portland. About three weeks thereafter, or from January 4, 1901, to and including September 3, 1907, or a little less than a month prior to his daughter's departure to Chicago, Consor sent from that city monthly to Lucke a post office money order for $35. The statute declares that no claim that has been rejected by the representative of a decedent's estate "shall be allowed by any court, referee, or jury, except upon some competent or satisfactory evidence other than the testimony of the claimant." Section 1241, L. O. L. Complying with this requirement, there was offered in evidence the deposition of Jessie H. Consor wherein it was stated that after the

death of Mrs. Lucke, which occurred in February, 1907, Mr. Lucke, having received a post office order from her father for $35, in answer to her inquiry as to why the money was sent, was informed that "it was for our living expenses." As further obedience to the legal mandate referred to, there were offered in evidence duplicate receipts for money orders issued by sub post offices in Chicago for $35 each, of various dates and numbers, and also letters written to Consor by Mr. Lucke or his wife, usually signed "Papa" or "Mother" acknowledging the receipt "of the blue paper," "money order," remittance," "enclosure," "usual order," etc., without specifying the sum received, except in a few instances. One of these letters written by Mrs. Lucke April 9, 1901, informs Consor that she had taken an invalid lady to board. Another letter written May 16, 1901, by her to him contains the following statement:

"I am in hope we can reduce your remittance if our boarder is a continued success."

Lucke on May 23, 1901, wrote Consor in part as follows:

"Yours of the 19th inst. and encd. two postal money orders, each for one hundred dollars, $200, came to hand this 3 o'clock p. m. Many thanks for your promptness. Yes there are only $300 to come yet and I can assure you that all will be spent judiciously and carefully and that to date we can say we own the most valuable of all properties within three miles around us, and after a while you will realize that this was a most lucky investment. Our Providence Group" (referring to mining claims in Baker County), "is looming up, according to experts' opinion. Many a one would now like to be a part owner. * * As for your own share in this don't you worry. You need no money. You have done your share and I thank you for it and promise that you will have your 1-3 interest, as it is, without another dollar on your part."

Mrs. Lucke on June 16, 1901, wrote a letter from which the following excerpt is taken:

"I hope in some way you will be fully repaid for your great kindness to us. If for no other reason than this, I trust the mines will be a success and thus prove a blessing to all of us"—referring to mines and mining claims in Baker county in which she and Consor held a joint interest.

A letter written by her to him August 31, 1901, contains the following clause:

"I suppose Papa spoke in his letter of the receipt of your remittance that we received early in August. We were busy with our sick boarder. Consequently I did not write. Many thanks all the same. Your kindness in this way enables us to keep Anna with us"—referring to a servant.

A letter written by Lucke to Consor, September 5, 1901, from Annex, which is supposed to be near the mining claims, contains the following language:

"Yesterday your welcome letter arrived with the usual remittance. Many, many thanks. We concluded on account of your kindness to reciprocate and as mother is sole owner of everything here she has made up her mind with me to fully compensate you and make out legal papers to secure your interest with us in case of our death."

Whether the word "here," in the excerpt quoted, limited Mrs. Lucke's ownership to the property in Baker County, or extended the proprietorship to all her property in the State of Oregon, cannot be ascertained from an inspection of the writing. Lucke on April 10, 1902, writing to Consor from Portland, and referring to Baker County and to the mining claims, said:

"I got a letter from Sumpter, telling me that snow will be one month later up there this year so I won't go till May. I shall send your deed to you soon from the

recorder's office at Sumpter. My time when there will be principally occupied to sell the group during summer. As soon as we strike it richer it will sell easy enough."

Lucke on May 31, 1902, wrote Consor in part as follows:

"Yours of the 25th ecl. the $200 postal money orders came to hand yesterday. * * It is our sincere wish and desire to have you with us and in the end continue to occupy this home with Jessie and for her sake to be near her and to enjoy it together always."

Mrs. Lucke on September 23, 1902, wrote Consor a letter from which the following extract is taken:

"By the way, do you know if there was really any deed of that lot ever made to Jennie? We cannot find any record of the same at the courthouse, and we have no papers to show there is any such deed unless among her papers. Maybe we thought 'our' will made all in her favor would cover the whole premises, but now that the lot belongs entirely to you, and if there is no such paper you must have those made. I remember us speaking about it when you were here, under the impression there was a deed and therefore it must be held for Jessie until she was of age."

It is supposed the "Jennie" referred to in the letter was Mrs. Consor, who died September 25, 1900, and the lot mentioned is a tract of land in Sunnyside addition which Mrs. Lucke on April 18, 1895, stipulated in a bond for a deed to convey to Mrs. H. P. Consor upon the payment of $227.50. Consor testified that after the death of his wife he paid the sum of money specified, whereupon Mrs. Lucke and her husband conveyed the premises to him. Lucke on July 7, 1904, wrote Consor as follows: "Yours of the 3rd inst. & usual order at hand. * * Thanks to you for all you have done so far. You will surely be repaid and we shall then have a better mine than ever."

Testimony was introduced to the effect that Mr. and Mrs. Lucke, referring to the $35 a month received from Consor, stated to a witness that the money was for keeping Jessie and for living expenses; that music lessons taken by Consor's daughter were paid for by his sisters, who also furnished Jessie's wearing apparel; and that $15 a month was a reasonable compensation for her board, lodging, etc. It further appears that Lucke having complained of the expenses incurred in administering upon the estate of his wife, who died in February, 1907, Consor wrote him, suggesting that, if he desired to lessen the outlay of an administration of his estate in case of death, he could convey the property in Portland to the claimant, and that the receipt of this letter so displeased Lucke that he destroyed the will which he had executed. Who were to have been the recipients of his bounty by the last testament is not disclosed.

The foregoing is a brief epitome of the evidence, and based on a consideration of the entire probative matter presented at the trial of the issues the jury were instructed to the effect that, the demand having been rejected by the administrator, the claimant was required to produce some competent or satisfactory evidence other than his own testimony in order to entitle him to establish the claim as an indebtedness against the estate. An exception was taken by counsel for the administrator to a refusal to charge the jury as follows:

"The court instructs you that post office money order receipts in evidence in this case and the acknowledgment of this receipt by the deceased, if you find that to be a fact, are not in themselves proof of a loan of money by claimant to decedent, or proof that decedent was indebted to claimant in any sum whatever"

It is maintained that an error was committed in this respect. It is insisted by counsel for the claimant, how-

ever, that as the bill of exceptions has attached thereto all the testimony, etc., it cannot affirmatively be said from a consideration thereof that there was no evidence given at the tral to support the verdict, and, such being the case, Section 3 of Article VII of the organic law, as amended November 8, 1910 (Laws 1911, p. 7), is controlling, from which it follows that the judgment is proper, and should be affirmed notwithstanding any error that might have been committed at the trial.

1. It will be remembered that our statute declares that no demand against a decedent's estate that has been rejected by an administrator or executor shall be allowed by any court or jury, "except upon some competent or satisfactory evidence other than the testimony of the claimant." Section 1241, L. O. L. That Consor sent $35 each month to Lucke is unquestioned; but as to whether or not any part of that sum constituted a loan, and was so understood at the time the money was received, is not directly admitted by any of the letters offered in evidence. It is possible the jury might have inferred from these letters that a loan of $20 a month was made by Consor to Lucke. The sworn declarations of the claimant, respecting his demand against the estate, unless they were supported in some particulars by competent or satisfactory evidence, could not be considered by the jury. They alone were authorized to say by their verdict that the inference of an admission to repay that sum of money or some part of it was deducible from a consideration of the letters. An inference is a species of evidence, but it is believed that the clause of the fundamental law referred to requires a greater degree of proof than is afforded by such indirect probative matter. In our opinion there was "no evidence," within the meaning of that phrase, as used in the amendment of the constitution, adequate to

support the verdict, and, this being so, judgment cannot be affirmed on the legal principle invoked.

2. The instruction which the court refused to give was predicated on the disputable deduction which the law expressly directs to be made from particular facts to-wit: "That money paid by one to another was due to the latter." Section 799, subd. 7, L. O. L. "The burden or proof," says a tex-writer, "is shifted by those presumptions of law which are rebuttable; by presumptions of fact of the stronger kind; and by every species of evidence strong enough to establish a *prima facie* case against a party." Chamberlayne's Best Evidence (International Ed.) § 273.

3. In civil actions the rule prevails that a presumption when invoked by a party remains available until the deduction is overcome by opposing evidence or is broken in upon by a countervailing presumption. *Bates* v. *Pricket,* 5 Ind. 22 (61 Am. Dec. 73) ; *Adams, Assignee* v. *Slate,* 87 Ind. 573; *Louisville, etc., Ry. Co.* v. *Thompson, Adm'r,* 107 Ind. 442 (8 N. E. 18: 9 N. E. 357: 57 Am Rep. 120) ; *Myers* v. *City of Kansas,* 108 Mo. 480 (18 S. W. 914).

4. Tested by this legal principle, we do not think the presumption declared by our statute and included in the requested instructions was overcome by adverse proof of the degree required. If from a consideration of the letters received in evidence, when the language employed was construed in the light of the deduction invoked, the jury could have inferred a loan of the money demanded, their verdict should be upheld. In *Erhart* v. *Dietrich,* 118 Mo. 418, 427 (24 S. W. 188, 191), the court said: "Presumptions serve a most useful and indispensable part in the correct decision of many questions but they are out of place when the facts are known or are admitted." In the case at bar, the loan

was not admitted, nor was it established with that degree of certainty which the law exacts from a claimant against the estate of a person whose voice has been silenced by death so as to render the presumption unavailing. In view of the conclusion reached, no comment will be made upon the evidence received.

Believing that an error was committed in refusing to give the instruction requested and that the mistake in this respect affected a substantial right, the judgment is reversed, and a new trial ordered.

REVERSED.